UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOEANA M. CUTILLO,

                          Plaintiff,

v.                                                    5:17-CV-0609
                                                      (MAD/WBC)

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

_____

APPEARANCES:                                  OF COUNSEL:

OLINSKY LAW GROUP                             HOWARD D. OLINKSY, ESQ.
 Counsel for Plaintiff
300 S. State St., Ste. 420
Syracuse, NY 13202

U.S. SOCIAL SECURITY ADMIN.                   ANDREEA LECHLEITNER, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
 Counsel for Defendant
26 Federal Plaza – Room 3904
New York, NY 10278


William B. Mitchell Carter, U.S. Magistrate Judge,

## REPORT and RECOMMENDATION

      This matter was referred for report and recommendation by the Honorable Mae

A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local

Rule 72.3(d).  (Dkt. No. 6.)  This case has proceeded in accordance with General Order

18.

      Currently before the Court, in this Social Security action filed by Joeana M.

Cutillo ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the

Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-

motions for judgment on the pleadings.  (Dkt. Nos. 14, 16.)  For the reasons set forth below, it is recommended that Plaintiff's motion be denied and Defendant's motion be granted.

## I.   RELEVANT BACKGROUND

### A.   Factual Background

Plaintiff was born in 1973.  (T. 94.)  She completed a four year college.  (T. 261.) Generally, Plaintiff's alleged disability consists of spinal stenosis, occipital neuralgia, and anxiety.  (T. 260.)  Her alleged disability onset date is August 18, 2011.  (T. 94.) Her date last insured is December 31, 2015.  (*Id.*)  She previously worked as a registered nurse.  (T. 262.)

### B.   Procedural History

On March 25, 2013, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act.  (T. 94.)  Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ").  On July 1, 2015, Plaintiff appeared before the ALJ, Laura Michalec Olszewski.  (T. 37-81.)  On October 19, 2015, ALJ Olszewski issued a written decision finding Plaintiff not disabled under the Social Security Act.  (T. 10-29.)  On March 31, 2017, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (T. 1-6.)  Thereafter, Plaintiff timely sought judicial review in this Court.

### C.   The ALJ's Decision

Generally, in her decision, the ALJ made the following five findings of fact and conclusions of law.  (T. 15-22.)  First, the ALJ found Plaintiff met the insured status

requirements through December 31, 2015 and Plaintiff had not engaged in substantial gainful activity since August 18, 2011. (T. 15.) Second, the ALJ found Plaintiff had the severe impairments of cervical spine disease, thoracic and lumber spine disease, depression, and anxiety. (*Id.*) Third, the ALJ found Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (*Id.*) Fourth, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform a reduced range of sedentary work. (T. 17.)[1] The ALJ determined Plaintiff:

> [m]ay sit or stand at her option; this means that [Plaintiff] needs the freedom to alternate position from sitting to standing as much or as little as she deems necessary. Please assume that the alternate sitting and standing or the time to change from one position to another does not interrupt [Plaintiff's] ability to remain on task. Moreover, [Plaintiff] can occasionally climb ramps and stairs but should never climb ladders and scaffolds. She can occasionally balance and stoop. She should never kneel, crouch and crawl. Furthermore, [Plaintiff] should work in a low-stress environment defined as involving occasional use of judgment, occasional decision-making, and occasional changes in work setting. She can perform simple and routine tasks. Finally, [Plaintiff] can have occasional interactions with supervisors, co-workers and the public.

(*Id.*) Fifth, the ALJ determined Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 21.)

---

[1]    Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

II.    **THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION**

A.    **Plaintiff's Arguments**

Plaintiff makes two separate arguments in support of her motion for judgment on the pleadings.  First, Plaintiff argues the ALJ erred in formulating Plaintiff's RFC because she improperly rejected the opinion of Plaintiff's treating doctors regarding Plaintiff's mental and physical limitations and afforded greater weight to non-treating source evaluations.  (Dkt. No. 14 at 19-26 [Pl.'s Mem. of Law].)  Second, and lastly, Plaintiff argues the ALJ failed to reconcile the discrepancy between the vocational expert's testimony and the DOT and SCO; and the ALJ's RFC precludes a job identified by the vocational expert.  (*Id.* at 26-27.)

B.    **Defendant's Arguments**

In response, Defendant makes two arguments.  First, Defendant argues the ALJ's RFC finding is supported by substantial evidence.  (Dkt. No. 16 at 7-19 [Def.'s Mem. of Law].)  Second, and lastly, Defendant argues the ALJ properly relied on the vocational expert's testimony.  (*Id.* at 19-22.)

III.    **RELEVANT LEGAL STANDARD**

A.    **Standard of Review**

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether

the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

## B.      Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The Supreme Court has recognized the validity of this sequential evaluation process.  *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987).  The five-step process is as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).

## IV.    ANALYSIS

The RFC is an assessment of "the most [Plaintiff] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a)(1).  The ALJ is responsible for assessing Plaintiff's RFC based on a review of relevant medical and non-medical evidence, including any statement about what Plaintiff can still do, provided by any medical sources.  *Id.* at §§ 404.1527(d), 404.1545(a)(3), 404.1546(c)[2].

In evaluating medical source statements, the Second Circuit has long recognized the treating physician rule set out in 20 C.F.R. § 404.1527(c).  " '[T]he opinion of a

---

[2]     Effective March 27, 2017, many of the regulations cited herein have been amended, as have SSRs cited herein. Nonetheless, because Plaintiff's social security applications were filed before the new regulations and SSRs went into effect, the Court reviews the ALJ's decision under the earlier regulations and SSRs.

claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' " *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).

There are situations where the treating physician's opinion is not entitled to controlling weight, in which case the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' " *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)).  However, "[w]here an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.*, No. 3:15-CV-1196, 2017 WL 782979, at *4 (N.D.N.Y. Jan. 23, 2017), report and recommendation adopted by 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017) (citing *Atwater v. Astrue*, 512 F. App'x. 67, 70 (2d Cir. 2013)).

After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.' " *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129).  "The failure to provide 'good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.' " *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129-130).

Plaintiff began treatment with her primary care physician, Jeffrey Wike, M.D., in 2011.  (T. 343, 534.)  Dr. Wike completed a medical source statement on January 30,

2013 and provided an updated statement on January 13, 2015.  (T. 343-348, 498-505.)
In his 2013 statement, Dr. Wike noted he treated Plaintiff since 2011 for pain
management related to her thoracic and cervical spine pain and spasms.  (T. 343.)  Dr.
Wike described Plaintiff's symptoms as intractable left sided thoracic pain and spasms;
bilateral trapezius spasms; and C2-C3 facet pain.  (*Id.*)  He noted Plaintiff's symptoms
limited Plaintiff's activities of daily living.  (*Id.*)  Dr. Wike stated he relied on an MRI of
Plaintiff's thoracic spine from 2011 which indicated "small disc herniation T2-3, T3-4
indenting ventral margin of thecal sac [and] mild spondylolytic change."  (*Id.*)  Dr. Wike
listed Plaintiff's diagnosis as left sided thoracic spasms with thoracic spondylolysis,
bilateral trapezius spasms, low back pain, and occipital neuralgia.  (*Id.*)  Dr. Wike listed
Plaintiff's treatment as trigger point injections and prolotherapy injections provided by
another provider, John Finkenstadt, M.D.  (T. 344.)  He indicated Plaintiff's prognosis
was poor.  (*Id.*)

Dr. Wike provided answers to questions regarding Plaintiff's physical capabilities.
When asked if Plaintiff's impairment prevented her from standing for six to eight hours,
Dr. Wike answered "yes."  (T. 344.)  Dr. Wike wrote Plaintiff "usually can stand for 20-30
[minutes] before requiring a position change."  (*Id.*)  When asked if Plaintiff's impairment
prevented her from sitting upright for six to eight hours, Dr. Wike answered "yes."  (*Id.*)
He indicated Plaintiff, as with standing, could sit for 20 to 30 minutes before needing to
change position.  (*Id.*)  When asked why Plaintiff could not stand and/or sit for six to
eight hours, Dr. Wike responded "severe thoracic paravertebral and latissimus dorsi
spasms."  (T. 345.)  When asked if Plaintiff's impairment required her to lie down during

the day, Dr. Wike answered "yes." (*Id.*)  Dr. Wike noted Plaintiff reported she could walk for twenty minutes continuously.  (*Id.*)

Dr. Wike checked the box indicating Plaintiff could "rarely," defined as 0-30% of the time, reach above her shoulders and reach down towards floor.  (T. 345.)  He checked the box indicating Plaintiff could "frequently," defined as 30-70% of the time, reach down to her waist level and "consistently," defined as 70-100% of the time, handle objects and handle with her fingers.  (*Id.*)  When asked how much weight Plaintiff could "lift and carry during an eight hour period," Dr. Wike checked the box for five to ten pounds.  (*Id.*)  When asked how much weight Plaintiff could "lift and carry regularly/daily," Dr. Wike checked the box for less than five pounds.  (*Id.*)  Dr. Wike indicated his opined limitations were due to Plaintiff's neck and thoracic spasms "elicited by repetitive motions."  (T. 346.)

Regarding non-exertional limitations, Dr. Wike indicated Plaintiff could bend to 60 degrees; could squat, but not repetitively; and could kneel, but not repetitively.  (T. 346.)  Dr. Wike stated Plaintiff's opiate medication impaired her concentration.  (*Id.*)

Dr. Wike further answered questions regarding Plaintiff's pain.  He indicated the nature of Plaintiff's pain was "spastic muscle contraction" and "disc derangement."  (T. 346.)  He indicated her pain was "constant" and a level of seven out of ten.  (*Id.*)  When asked to rate Plaintiff's credibility regarding her claims of pain, Dr. Wike answered "very good."  (T. 347.)  When asked if there were any objective medical reasons for Plaintiff's pain, Dr. Wike wrote "internal disc derangement and spastic muscular contractions." (*Id.*)

In a statement dated January 13, 2015, Dr. Wike indicated that Plaintiff continued to struggle with thoracic and cervical spine pain, was awaiting trigger point injections and continued to attend physical therapy.  (T. 504.)  He further stated "[g]iven current degree of infirmity and pain, total disability is recommended."  (*Id.*)  When asked if Plaintiff's limitations of function, as outlined in the 2013 statement existed and persisted to the same degree since August 18, 2011, Dr. Wike answered "yes."  (T. 505.)  Dr. Wike wrote "[a]s previous, little change despite multiple evaluations and interventions."  (*Id.*)

The record also contains a medical source statement provided by Plaintiff's pain management provider, Farah Siddiqui, M.D.  (T. 509-512, 790-794.)  Dr. Siddiqui indicated he began treating Plaintiff in October of 2014 for her brachial neuritis radiculitis; spondylosis cervical without myelopathy, intervertebral disc degeneration cervical, intervertebral disc degeneration thoracic; and myalgia and myositis unspecified.  (T. 509.)  When asked if Plaintiff had nerve root compression, Dr. Siddiqui answered "yes" and when asked if Plaintiff had neuro-anatomic distribution of pain, the doctor answered "yes."  (*Id.*)  He reported Plaintiff's pain as "[s]tabbing, burning pain in the inter scapular area with radiation into left axilla" and referred to a treatment note dated October 30, 2014.  (T. 509, referring to T. 447.)  Dr. Siddiqui indicated Plaintiff had reduced range of motion in her spine and muscle weakness in her left interossei.  (T. 509.)  The doctor indicated Plaintiff did not have sensory or reflex loss and that there was no involvement of the lumbar spine.  (T. 510.)  The doctor wrote Plaintiff developed osteomyelitis resulting in painful limited range of motion.  (*Id.*)

Dr. Siddiqui provided physical functional limitations.  He indicated Plaintiff could sit for ten minutes at a time before needing to move.  (T. 510.)  He indicated Plaintiff could stand for ten minutes at a time before needing to change position.  (T. 511.)  Dr. Siddiqui indicated Plaintiff could sit and stand/walk less than two hours total in an eight hour workday with normal breaks.  (*Id.*)  Dr. Siddiqui opined Plaintiff could never: lift and carry any weight; twist, stoop/bend, crouch/squat, climb ladders, climb stairs; and look down, turn head right or left, look up.  (*Id.*)[3]  Dr. Siddiqui opined Plaintiff could occasionally use her hands; frequently finger; and rarely use her arms for reaching.  (T. 512.)  Dr. Siddiqui indicated Plaintiff would need an unscheduled break every one to two hours for fifteen minutes.  (*Id.*)  When asked what percentage of time during an eight hour workday Plaintiff would be "off task," the doctor checked the box "more than 20%." (*Id.*)  When asked how many days per month Plaintiff would be likely to be absent from work, Dr. Siddiqui checked the box "more than four days per month."  (*Id.*)  On June 2, 2015, Dr. Siddiqui completed a statement indicating that the limitations he provided in his January 2015 opinion still existed.  (T. 794.)  Dr. Siddiqui stated a "recent MRI show[ed] possible interval worsening."  (*Id.*)

In addition to the treating source opinions, the record contains an orthopedic examination and medical source statement provided by consultative examiner Richard Weiskopf, M.D.  (T. 513-517.)  Dr. Weiskopf examined Plaintiff on April 17, 2015 and opined she had no limitation in her ability to sit; mild limitation in her ability to stand; moderate limitation in her ability to walk; and moderate to severe limitation in her ability

---

[3]    When asked how often Plaintiff could "look up" both spaces for "never" and "occasionally" were checked off.  (T. 511.)

to bend, lift, climb, and carry.  (T. 517.)  He opined Plaintiff had good use of her hands regarding strength and fine motor activities.  (*Id.*)

Regarding Plaintiff's mental functional capacity, the record contains a medical source statement from treating provider Ronald Grant, M.D. and consultative examiner, Jeanne Shapiro, Ph.D.  (T. 428-432, 443-446.)

Dr. Grant indicated he began treating Plaintiff for anxiety in 2013.  (T. 443.)  In the area of understanding and memory, Dr. Grant opined Plaintiff had "moderate" to "marked" limitation in her ability to remember locations and work-like procedures; "marked" limitation in her ability to understand and remember very short and simple instructions; and "marked" limitation in her ability to understand and remember detailed instructions.  (T. 444.)[4]

In the area of concentration and persistence, Dr. Grant opined Plaintiff had "moderate" limitations in her ability to: carry our very short and simple instructions and sustain an ordinary routine without special supervision.  (T. 444-445.)  He opined Plaintiff had "extreme" limitations in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances a schedule.  (*Id.*)  He opined she had "marked" limitations in her ability to: work in coordination with or proximity to others without being distracted by them and make simple work-related decisions.  (T. 445.)  In the margin of this section of the form, Dr.

---

[4]        Dr. Grant's form contained the following definitions: none, there are no limitations on the ability to function in this area; mild, there are limitations on ability to function but they are mild or transient; moderate, the ability to function in this area is less than marked but more than mild; marked, the ability to function in this area is seriously limited; and extreme, the ability to function in this area is precluded.  (T. 444.)

Grant wrote "mental status is normal save for anxiety and occasional depression."  (T. 444.)  Dr. Grant also wrote "[b]ut unable to do so or execute unable to work."  (*Id.*)  Dr. Grant noted a section of his opined limitations in this area applied "when without back pain" and "unable to do any of these [functional work demands] practically speaking as unable to work due to medical condition."  (T. 445.)

In the area of social interaction, Dr. Grant indicated Plaintiff had "moderate" limitations in her ability to: interact appropriately with the general public; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness[5].  (T. 445.)  He opined Plaintiff had "marked" limitations in her ability to accept instructions and respond appropriately to criticism from supervisors.  (*Id.*)  Dr. Grant wrote in the margin "when without back pain" and "unable to carry these out practical due to medical condition."  (*Id.*)

In the area of adaptation, Dr. Grant opined Plaintiff had "marked" limitations in her ability to: respond appropriately to changes in the work setting; ability to travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of others; and tolerate normal levels of stress.  (T. 445-446.)  He opined Plaintiff had "mild" limitations in her ability to be aware of normal hazards and take appropriate precautions.  (T. 446.)  In the margin Dr. Grant again wrote "when not in pain" and "but severely limited by medical condition."  (*Id.*)

When asked if Plaintiff's impairment substantially interfered with her ability to work on a regular and sustained basis at least 20% of the time, Dr. Grant answered

---

[5]        Dr. Grant added "due to physical limitations."  (T. 445.)

"yes." (T. 446.) Dr. Grant indicated Plaintiff was "currently experiencing severe anxiety, insomnia" and "often irritable due to pain and anxiety." (*Id.*) He stated Plaintiff could not maintain a schedule consistently, her anxiety increased her pain, and as her pain increased so did her anxiety and instability. (*Id.*)

Dr. Shapiro examined Plaintiff on June 28, 2013. (T. 428-432.) On exam, Dr. Shapiro observed Plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate. (T. 430.) She observed Plaintiff's eye contact was appropriate, her speech fluent, her thought processes were coherent and goal directed, her affect was congruent to her thoughts and speech, her mood was depressed, her sensorium was clear, and she was oriented. (*Id.*) She further observed Plaintiff's attention and concentration were intact, her recent and remote memory skills were intact, and she appeared to have average cognitive functioning. (*Id.*)

Dr. Shapiro opined Plaintiff appeared to have no limitation in: understanding and following simple instructions and directions; performing simple tasks; performing complex tasks; learning new tasks; making appropriate decisions; and relating to and interacting with others. (T. 431.) She opined Plaintiff appeared to have a mild limitation maintaining attention and concentration for tasks; attending to a routine, and maintaining a schedule. (*Id.*) She opined Plaintiff appeared to have a moderate limitation in her ability to deal with stress. (*Id.*)

In July of 2013, non-examining State agency medical consultant, T. Harding, Ph.D. reviewed Plaintiff's medical record, including Dr. Grant's medical source statement and Dr. Shapiro's examination and medical source statement. (T. 86-93.)

Dr. Harding essentially opined Plaintiff could perform semi-skilled to skilled range of work.  (T. 90-91.)

In weighing the medical opinion evidence in the record, the ALJ afforded the opinions of Plaintiff's treating sources "only partial weight."  (T. 20.)  The ALJ acknowledged Drs. Wike, Grant, and Siddiqui were treating physicians and familiar with the "longitudinal progression" of Plaintiff's impairments; however, the ALJ determined the opinions were "insufficiently supported by objective and clinical evidence" and the opinions "appear to place excessive reliance on [Plaintiff's] subjective allegations.  (*Id.*)

The ALJ afforded the opinions of consultative examiner, Dr. Shapiro, and non-examining State agency medical consultant, Dr. Harding, "great weight."  (T. 20.)  The ALJ reasoned the consultative doctors' opinions were "based on a specialized understanding psychiatric disorders, a familiarity with Social Security's adjudicative process, and [were] consistent with medical record as a whole which indicate[d] only mild and conservative psychiatric treatment."  (*Id.*)  The ALJ afforded Dr. Weiskopf's opinion "significant weight."  (T. 21.)  The ALJ reasoned Dr. Weiskopf's opinion was based on a "thorough in-person examination" and was "supported by clinical findings, and [was] consistent with the medical record as a whole, which indicate[d] that [Plaintiff] [had] generally received only conservative treatment for her impairments."  (T. 20-21.)

Plaintiff asserts the ALJ committed legal error because she discounted the treating sources' opinions based on their recommendation of conservative treatment.  (Dkt. No. 21 at 19 [Pl.'s Mem. of Law].)  To be sure, the Second Circuit held that conservative treatment does not constitute "compelling" evidence sufficient in itself to overcome an "otherwise valid medical opinion."  *Shaw v. Chater*, 221 F.3d 126, 134 (2d

Cir. 2000).  However, an ALJ may rely on conservative treatment as "additional evidence" to support her determination.  *See Tricarico v. Colvin*, 681 F. App'x 98, 100 (2d Cir. 2017) (ALJ properly afforded less than controlling weight to treating source opinion due to internal inconsistencies, such as the fact that the extreme limitations were not consistent with conservative treatment which consisted of pain medication and physical therapy); *see also Netter v. Astrue*, 272 F. App'x 54, 56 (2d Cir. 2008) (ALJ properly took into consideration plaintiff's conservative treatment regimen as additional evidence supporting his determination to afford less than controlling weight to a treating source's opinion, rather than compelling evidence to overcome the opinion).

Here, the ALJ did not rely on Plaintiff's conservative course of treatment as compelling evidence to discredit the treating sources' opinions.  First, the ALJ did not reject the entirety of all of the treating sources' opinions based on Plaintiff's course of conservative treatment.  The ALJ afforded the treating sources' opinions "partial weight," and as outlined further herein, the ALJ's RFC determination accounted for many of the physical limitations provided by the treating sources.  Second, the ALJ relied on Plaintiff's conservative treatment as one factor in her overall analysis of the medical source opinions in the record.  The ALJ also took into consideration other objective and clinical findings, and other opinion evidence in the record in making a determination to afford the opinions "partial weight."  Therefore, the ALJ properly considered Plaintiff's conservative treatment as additional evidence in her analysis of the medical opinion evidence in the record.

Plaintiff further asserts the ALJ committed legal error in her analysis of the treating sources' opinions because she failed to properly apply the treating physician

rule.  (Dkt. No. 19 at 21-25 [Pl.'s Mem. of Law].)  Plaintiff asserts the treating sources were specialists and their opinions were well supported by acceptable laboratory and diagnostic techniques, objective medical evidence, and not inconsistent with substantial evidence in the record.  (*Id.*)  In support of her argument, Plaintiff provides citation to medical evidence in the record which she contends supports the various treating sources' opinions.  (*Id.*)

However, under the substantial evidence standard of review, it is not enough for Plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position.  Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record.  *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Wojciechowski v. Colvin,* 967 F.Supp.2d 602, 605 (N.D.N.Y. 2013) (Commissioner's findings must be sustained if supported by substantial evidence even if substantial evidence supported the plaintiff's position); *see also Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x. 51, 52 (2d Cir. 2016) (a reviewing court " 'may not substitute [its] own judgment for that of the [Commissioner], even if [it] might justifiably have reached a different result upon a *de novo* review.' "); *see also Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (reviewing courts must afford the Commissioner's determination considerable deference and cannot substitute own judgment even if it might justifiably have reached a different result upon a *de novo* review).  Although Plaintiff provides evidence in the record which could support her assertions, substantial evidence in the record, as outlined herein, ultimately supported the ALJ's determination and therefore the ALJ's determination must be upheld.

The ALJ's mental RFC determination was ultimately supported by the medical opinions of Dr. Shapiro and Dr. Harding.  It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e). *Netter*, 272 F. App'x at 55-56 ("Under the applicable regulations, even nonexamining sources may override treating sources' opinions, provided they are supported by evidence in the record.") (internal citations omitted); *see also Heagney-O'Hara v. Comm'r of Soc. Sec.,* 646 F. App'x 123, 126 (2d Cir. 2016); *Monette v. Colvin,* 654 F. App'x 516 (2d Cir. 2016); *Snyder v. Colvin,* 667 F. App'x 319 (2d Cir. 2016).

Indeed, the opinions of Drs. Shapiro and Harding were consistent with other evidence in the record.  In March of 2013, Craig Montgomery, M.D., noted Plaintiff had a normal mood and affect, her behavior was normal, and her judgment and thought content was normal.  (T. 476.)  Plaintiff reported increased anxiety and depression on August 26, 2013 and reported to Dr. Wike that she had recently been denied Social Security benefits.  (T. 608.)  Dr. Wike noted Plaintiff's affect was anxious and appropriate to mood; her speech was clear, coherent, pressured and rapid; her thought processes were clear flowing and she had thoughts of hopelessness; her judgment was realistic and her insight was appropriate.  (*Id.*)  At a follow up appointment with Dr. Wike in September of 2013, Plaintiff denied increased anxiety and depression.  (T. 605.)  In October 2014, Andrianne O'Quinn, M.D. noted Plaintiff's recent and remote memory was intact, she concentrated well, and her speech was smooth and clear.  (T. 448.)  On multiple doctor's visits, Plaintiff denied increased anxiety and depression.  (T. 373, 357,

360, 362, 448, 588, 592, 596, 599, 602, 605.)  Therefore, substantial evidence supported the ALJ's mental RFC determination.

The ALJ's physical RFC was also supported by substantial evidence in the record.  The ALJ afforded the treating sources' opinions "partial weight" and many of the opined physical limitations were provided for in the RFC.

The RFC determination provided for a sit/stand at will limitation, thus allowing Plaintiff to change positions as needed, so long a she did not leave her work station.  (T. 17.)  This limitation is consistent with the postural limitations provided by Drs. Siddiqui and Wike.  (T. 344, 510-511.)  Although Dr. Siddiqui opined Plaintiff could never lift any weight, the ALJ's determination that Plaintiff could lift and carry the weight requirements of sedentary work was supported by Dr. Wike's opinion Plaintiff could lift up to ten pounds during an eight hour period and less than five pounds "regularly," and Dr. Weiskopf's opinion Plaintiff had "moderate to severe" limitations in lifting and carrying. (T. 345, 511, 517.)

Although many of the physical work related functional RFC limitations were supported by substantial evidence in the record, the ALJ's RFC determination failed to provide any limitation regarding Plaintiff's ability to reach.  Both Dr. Wike and Dr. Siddiqui indicated Plaintiff had a limited ability to reach.  (T. 345, 512.)  Although Dr. Weiskopf did not provide specific reaching limitations, he noted reduced range of motion of Plaintiff's shoulders on examination and he opined Plaintiff had "moderate to severe" limitations in activities which naturally include an aspect of reaching, such as, lifting, carrying, and climbing.  (T. 516-517.)[6]  Therefore, the medical opinion evidence in the

---

[6]        Of note, it is unclear from Dr. Weiskopf's statement if the "climbing" limitation was in reference to climbing stairs (which would not require reaching) or climbing items such as ladders (which

record indicated Plaintiff had greater limitations in her ability to reach than provided for in the RFC determination.

To be sure, the Second Circuit has held that the failure to explicitly engage in a function-by-function analysis as part of the RFC assessment does not constitute a *per se* error requiring remand.  *See Chichocki v. Astrue,* 729 F.3d 172, 174 (2d Cir. 2013).  Further, an ALJ is not explicitly required to reconcile every conflicting shred of medical evidence.  *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012).  However, the Second Circuit has remanded where an ALJ failed to discuss a plaintiff's ability to reach and the record contained medical opinion evidence asserting plaintiff's reaching ability was limited.  *Sesa v. Colvin*, 629 F. App'x 30, 33 (2d Cir. 2015).  Here, as in *Sesa*, not only did the ALJ's RFC not account for any reaching limitations despite evidence of limitations in that area, the ALJ's opinion did not discuss reaching at all.  (T. 17-22.)  However, although the ALJ failed to account for Plaintiff's limited ability to reach in her written RFC determination, any error was ultimately harmless.

At the hearing, the vocational expert ("VE") testified that a hypothetical person with Plaintiff's age, education, work experience, and RFC, could perform the occupations of order clerk and addresser.  (T. 69-72.)  On cross examination, Plaintiff's counsel posed two hypotheticals to the VE, one based on Dr. Siddiqui's medical source statement and one based on Dr. Wike's medical source statement.  (T. 73-74.)  The VE testified that under both hypotheticals, such a person could not work on a full-time sustained basis.  (T. 73-74.)

---

would require reaching).  (T. 517.)  Although the ALJ determined Plaintiff could not climb ladders and scaffolds, such limitation would not preclude all matter of reaching.

The ALJ proceeded to ask the VE if the occupations would still be available if a limitation to occasional overhead reaching and frequent reaching in all other directions were added to her original hypothetical.  (T. 74.)  The vocational expert testified the occupation of order clerk and addresser would not be eliminated.  (T. 74-75.)

The ALJ's reaching limitations posed to the VE mirrored Dr. Wike's opinion.  As outlined herein, Dr. Wike opined Plaintiff could reach "up above her shoulders" 0-30% of the workday; reach "down towards the floor" 0-30% of the workday; and reach "down to waist level" 30-70% of the workday.  (T. 345.)[7]  The VE further testified that according to the DOT, the occupations required "frequent" reaching; however, in his experience and opinion, the jobs would still apply because neither occupation required overhead reaching.  (T. 75.)[8]

Plaintiff argues the VE failed to provide a reasonable explanation for his assertion that the occupations do not require frequent overhead reaching.  (Dkt. No. 14 at 27 [Pl.'s Mem. of Law].)  However, the VE properly relied on his professional experience, which is sufficient.  *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) ("the vocational expert was not required to articulate a more specific basis for his opinion, and the ALJ reasonably credited this testimony, which was given on the basis of the expert's professional experience and clinical judgment, and which was not undermined by any evidence in the record").

---

[7]     Of note, Dr. Wike's medial source statement defined the term "rarely" as "0-30%."  (T. 345.)  A limitation to 0-30% performance of a work related functional activity in the workday more closely corresponds to the term "occasionally" as used by the Social Security Administration. *See* SSR 83-10 (" ' Occasionally' means occurring from very little up to one-third of the time.")

[8]     The DOT listings do not distinguish between the types of reaching, i.e. overhead, waist level.

Therefore, any error the ALJ made in failing to specifically address Plaintiff ability to reach in her written decision was harmless.  At the hearing the ALJ provided reaching limitations, supported by substantial evidence in the form of a treating source opinion, to the VE and the VE testified that the occupations provided would not be eliminated based on those addition of reaching limitations.

Plaintiff also asserts the ALJ failed to reconcile an inconsistency between the VE's testimony and the DOT with respect to the occupation of order clerk.  (Dkt. No. 14 at 26-27 [Pl.'s Mem. of Law].)  Plaintiff contends, according to the DOT the occupation of order clerk requires a level six in the "people" category and frequent talking.  (*Id.* at 26, referring to DOT 209.567-014.)  Plaintiff argues the "people" and "talking" requirements of order clerk are inconsistent with the ALJ's RFC which limited Plaintiff to "occasional interactions with supervisors, co-workers, and the public."  (*Id.*)

Although Plaintiff asserts there is a conflict between the VE's testimony and the DOT, the VE testified that his statements were consistent.  First, as stated by Defendant, the Second Circuit has held that a VE's deviations from the DOT are not necessarily incorrect or in conflict with the DOT.  *Jasinksi v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003).  Second, at the hearing, the VE testified that a person with the hypothetical mental RFC limitations could perform the occupation of order clerk.  (T. 71-72.)  The VE further testified that in his opinion, his testimony was consistent with the DOT.  (T. 71-72.)  Therefore, the VE's testimony did not conflict with the DOT.

The Second Circuit held where an ALJ asked a vocational expert to affirm his impartial evaluation and identify conflicts, and where counsel had an opportunity to cross-examine the vocational expert "[n]othing more was required" to resolve conflicts.

*Brault*, 683 F.3d at 450.  During the hearing the ALJ twice asked the VE if his testimony was consistent with the DOT and the expert answered "yes."  (T. 71-72.)  The ALJ sought and received a stipulation from Plaintiff's counsel regarding the VE's expertise and qualifications.  (T. 67.)  Plaintiff's counsel was given a full opportunity to cross-examine the VE.  (T. 72-75.)  Therefore, VE was not required, as Plaintiff argues, to "cite to any material, specific examples, [or] information not listed in the DOT" to support his testimony.  (Dkt. No. 14 at 27 [Pl.'s Mem. of Law].)

In sum, the ALJ did not commit legal error in her evaluation of the treating source opinions in the record.  The ALJ's mental RFC determination was supported by substantial evidence in the record.  Although the ALJ's physical RFC was also supported by substantial evidence, the ALJ failed to properly analyze and account for Plaintiff's reaching limitations.  However, any error the ALJ made in failing to include reaching limitations in her written RFC determination was harmless because there were a significant number of jobs in the national economy Plaintiff could perform despite reaching limitations.

**ACCORDINGLY**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health*

*and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ.

P. 6(a), 6(e), 72.

Dated:      May 4, 2018

William B. Mitchell Carter
U.S. Magistrate Judge